Angel Marti III (SBN 305300)
AMarti@cozen.com
COZEN O'CONNOR
601 S. Figueroa Street, Suite 3700
Los Angeles, CA 90017
Telephone:    213.892.7900
Facsimile:    213.892.7999

Rafael Rivera (To be admitted *Pro Hac Vice*)
rafaelrivera@cozen.com
COZEN O'CONNOR
3 WTC, 175 Greenwich Street, 55th Floor
New York, NY 10007
Telephone: (212) 453-3879
Facsimile: (646) 588-1372

Gary L. Gassman (To be admitted *Pro Hac Vice*)
ggassman@cozen.com
COZEN O'CONNOR
123 N. Wacker Drive, Suite 1800
Chicago, IL 60606
Telephone: (312) 382-3100
Facsimile: (312) 382-8910

*Attorneys for Defendant*
*StarStone Specialty  Insurance Company*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| STARSTONE SPECIALTY INSURANCE COMPANY, <br><br> Plaintiff, <br><br> vs. <br><br> VIEW OPERATING CORPORATION, F/K/A VIEW, INC. AND VIDUL PRAKASH, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Case No.: <br><br> **COMPLAINT FOR DECLARATORY JUDGMENT** |

Plaintiff, StarStone Specialty Insurance Company ("StarStone"), by and through its undersigned counsel, Cozen O'Connor, brings this Complaint against View Operating Corporation, f/k/a View, Inc. ("Private View") and Vidul Prakash, and in support thereof states as follows:

- 1 -

COMPLAINT

## PRELIMINARY STATEMENT

1. On March 8, 2021, Private View, which was a private "target company"[1] at the time, completed an initial public offering through a "de-SPAC merger transaction"[2] with CF Finance Acquisition Corp. II ("CF II"), a "special purpose acquisition company"[3] resulting in a combined entity called Public View.

2. In this lawsuit, StarStone seeks a declaration that a Follow Form Excess Liability Insurance Policy ("StarStone Policy") that it issued to Private View does not afford defense or indemnification coverage for the following lawsuits alleging securities violations: (1) *SEC v. Prakash*, No. 5:23-cv-03300, U.S. District Court for the District of Northern California ("SEC Lawsuit"); and (2) *Mehedi v. View, Inc. f/k/a CF Finance Acquisition Corp. II, et al.*, No. 5:21-cv-06374, U.S. District Court for the District of Northern California ("Mehedi Lawsuit").

3. StarStone also seeks a declaration that the StarStone Policy does not afford defense coverage for the following third-party discovery subpoenas issued in the SEC Lawsuit: (1) a Subpoena To Produce Documents, Information, or Objects or Permit Inspection of Premises in a Civil Action and a Subpoena to Testify at a Deposition in a Civil Action issued to Thomas Leppert ("Leppert Subpoenas"); and (2) a Subpoena To Produce Documents, Information, or Objects or Permit Inspection of Premises in a Civil Action and a Subpoena to Testify at a Deposition in a Civil

---

[1] A "target company" means an operating company or business. *See* 17 C.F.R. § 229.1601(d).

[2] A "de-SPAC merger transaction" means the business combination transaction between a special purpose acquisition company and a private operating company. *See* 17 C.F.R. § 229.1601(a).

[3] A "special purpose acquisition company" ("SPAC") means a company that has (1) indicated that its business plan is to: (i) conduct a primary offering of securities that is not subject to the requirements of Rule 419 under the Securities Act; (ii) complete a business combination, such as a merger, consolidation, exchange of securities, acquisition of assets, reorganization, or similar transaction, with one or more target companies within a specified time frame; and (iii) return proceeds from the offering and any concurrent offering (if such offering or concurrent offering intends to raise proceeds) to its security holders if the company does not complete a business combination, such as a merger, consolidation, exchange of securities, acquisition of assets, reorganization, or similar transaction, with one or more target companies within the specified time frame; or (2) represented that it pursues or will pursue a SPAC strategy. *See* 17 C.F.R. § 229.1601(b).

- 2 -

COMPLAINT

Action issued to Harold Hughes ("Hughes Subpoenas") (collectively, the "Third-Party Discovery SEC Lawsuit Subpoenas" and together with the SEC and Mehedi Lawsuits, the "Reported Matters").

4. The StarStone Policy follows form to a primary insurance policy issued by Ironshore Specialty Insurance Company ("Primary Policy").

5. The Primary Policy includes a Securities Exclusion, which states that coverage is unavailable for **Loss**[4] on account of any **Claim** alleging, based upon, arising out of, or attributable to any public offering of equity securities of the **Company** or the purchase or sale of, or offer or solicitation of an offer to purchase or sell, such equity securities subsequent to such public offering.

6. The Reported Matters allege that Private View completed an initial public offering through a de-SPAC merger transaction with CF II.

7. The Reported Matters allege that the de-SPAC merger transaction marked the introduction of Private View to the U.S. public securities markets.

8. As the target company, and party to the de-SPAC merger transaction, Private View, in connection with its public offering, issued its own securities.

9. The Reported Matters include allegations and securities-related violations based upon, arising out of, and attributable to Private View's public offering of equity securities, as well as the purchase or sale of, or offer or solicitation of an offer to purchase or sell, such equity securities subsequent to such public offering.

10. The **Insured** has admitted in a separate legal proceeding and in a court filing (the Advancement Action – defined below) that Private View completed an initial public offering through a de-SPAC merger transaction with CF II, and that Private View went public through a de-SPAC merger transaction.

---

[4] Words in bold have the same meaning and are defined in the Primary Policy and/or StarStone Policy annexed hereto as **Exhibits 10** & **11**.

- 3 -

COMPLAINT

11. The **Insured** provided sworn testimony to the SEC stating that the de-SPAC merger transaction is an initial public offering and a SPAC IPO.

12. Accordingly, the Securities Exclusion bars coverage for the Reported Matters in their entirety and StarStone owes no defense or indemnification coverage.

13. Private View also seeks defense coverage for the Third-Party Discovery SEC Lawsuit Subpoenas.

14. However, the Third-Party Discovery SEC Lawsuit Subpoenas, which were issued by attorneys, do not qualify as a **Claim** and do not allege a **Wrongful Act**, as both terms are defined under the StarStone Policy, and therefore do not trigger coverage.

15. For these reasons, which are explained in greater detail below, StarStone is entitled to a declaration that it does not owe defense or indemnification coverage for the Reported Matters.

## THE PARTIES

16. StarStone is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Ohio, and is primarily engaged in the business of issuing insurance policies to businesses and individuals.

17. Private View's principal place of business and headquarters is located in Milpitas California, and is a corporation organized and existing under the laws of the State of Delaware.

18. Prakash is a resident of Los Altos, California and an individual domiciled in California.

## JURISDICTION, VENUE, & DIVISIONAL ASSIGNMENT

19. This Court has subject matter jurisdiction and diversity jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(a)(1), because this is a civil action between citizens of different states and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

- 4 -

COMPLAINT

20. Jurisdiction is also founded upon the provisions of 28 U.S.C. § 2201 for the entry of a Declaratory Judgment.

21. Venue in this district is proper pursuant to both 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(2) because: (1) the StarStone Policy was issued to Private View at an address within this District: 195 S Milpitas Blvd., Milpitas, CA 95035; (2) Mr. Prakash is a resident of Los Altos, California, which is located within this District; (3) Private View's principal place of business and headquarters is located in Milpitas, California, which is within this District; and (4) the SEC Lawsuit and Mehedi Lawsuit are both pending before this Court in this District.

22. Under Civil Local Rule 3-2(e), this civil action should be assigned to the San Jose Division because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in Santa Clara County, where Private View's principal place of business is located.

## FACTUAL BACKGROUND

**I.    Private View's IPO Through a De-SPAC Merger Transaction**

23. Private View completed an initial public offering through a de-SPAC merger transaction with CF II. A copy of a Form 8-K is annexed hereto as **Exhibit 1**.

24. The de-SPAC merger transaction marked the introduction of Private View to the U.S. public securities markets.

25. As the target company, and party to the de-SPAC merger transaction, Private View, in connection with its public offering, issued its own securities.

26. The de-SPAC merger transaction was Private View's initial public offering because it resulted in Private View becoming part of an SEC reporting company—that is, CF II.

27. The de-SPAC merger transaction was Private View's initial public offering because it provided Private View with access to cash proceeds that CF II had previously raised from the public.

- 5 -

COMPLAINT

28. The de-SPAC merger transaction was Private View's initial public offering because the shareholders of CF II went from owning shares in a shell company to owning shares in Public View, which conducts the business of Private View.

29. Following Private View's public offering through the de-SPAC merger transaction with CF II, Public View continued to be led by the same senior management team that led Private View.

30. Existing holders of Private View stock agreed, prior to the public offering through the de-SPAC merger transaction with CF II, to continue being significant shareholders of Public View.

31. As part of Private View's initial public offering effected through the de-SPAC merger transaction with CF II, eight of its officers agreed to serve as officers of Public View.

32. As part of Private View's initial public offering effected through the de-SPAC merger transaction with CF II, five of its board of directors agreed to serve as officers of Public View.

33. Following Private View's public offering through the de-SPAC merger transaction with CF II, Public View traded on the NASDAQ Exchange under the ticker symbol VIEW.

## II.  The SEC Lawsuit

34. The SEC Lawsuit was filed on July 3, 2023, and names Prakash as the sole defendant. A copy of the operative complaint in the SEC Lawsuit is annexed hereto as **Exhibit 2**.

35. The SEC Lawsuit focuses on Prakash's misconduct in depriving investors of material information about Private View's financial condition before, during, and after its public offering of equity shares through the de-SPAC merger transaction with CF II.

36. The SEC characterizes the lawsuit as one involving financial reporting and an accounting fraud case arising from Prakash's role in View, Inc.'s failure to accrue for and disclose over $20 million in liabilities, depriving investors of material information about View's financial condition. (Compl., ¶ 1)

- 6 -

COMPLAINT

37.    The SEC Lawsuit alleges misleading SEC filings in connection with failing to properly disclose warranty liability costs in a (1) December 23, 2020 Form S-4 Registration and Proxy Statement; (2) January 19, 2021 Response Letter to an SEC Comment Letter; (3) January 26, 2021 Amended Form S-4; (4) February 16, 2021 Prospectus/Proxy Statement; (5) March 12, 2021 8-K; (5) and May 17, 2021 10-Q ("View's Materially Misleading SEC Filings").

38.    The SEC Lawsuit alleges that on "March 8, 2021, View merged with a subsidiary of CF Finance Acquisition Corp II ("CF II"), a special purpose acquisition company, and as a result, its post-merger shares became publicly traded." (Compl., ¶ 18)

39.    The SEC Lawsuit alleges that CF II "was a special purpose acquisition company and an SEC reporting company from May 2020 until its subsidiary merged with pre-merger View in March 2021." (Compl., ¶ 19)

40.    The SEC alleges that as View's CFO, Prakash was responsible for ensuring that View accurately disclosed the costs associated with its warranty liability, and was also responsible for ensuring that View's staff who prepared the company's liability for such warranty costs had the information needed to recommend an accurate warranty liability. (Compl., ¶ 4)

41.    Despite receiving queries from the SEC that raised questions and concerns regarding the adequacy of View's disclosed warranty liabilities, Prakash allegedly failed to address those questions and concerns and continued to maintain View's warranty liabilities at a level that excluded the Installation Costs that View had decided to incur. (Compl., ¶ 8)

42.    The SEC Lawsuit alleges that Prakash violated the antifraud, proxy disclosure, and books and records provisions of the federal securities laws. (Compl., ¶ 10)

43.    The SEC alleges that Prakash violated Section 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; Section 14(a) of the Securities Exchange Act of 1934

COMPLAINT

("Exchange Act") [15 U.S.C. § 78n(a)]; and Exchange Act Rules 14a-9 [17 C.F.R. § 240.14a-9] and 13b2-1 [17 C.F.R. § 240.13b2-1]. (*Id.*)

44.     The complaint alleges that on or around December 23, 2020, CF II filed with the SEC a Form S-4 Registration and Proxy Statement in connection with its proposed de-SPAC merger transaction with Private View. (Compl., ¶ 45)

45.     The complaint alleges that "all information regarding View in the publicly-available Form S-4 was supplied by View." (*Id.*)

46.     The complaint also alleges that "Prakash's name was used throughout the Proxy Statement. (Compl., ¶ 48)

47.     The SEC complaint alleges that Prakash failed to ensure, as was his responsibility, that the View staff involved in preparing the Form S-4 had all the relevant information. (Compl., ¶ 49)

48.     The SEC alleges that on or around January 19, 2021, CF II received a Comment Letter from the SEC regarding the Form S-4 filed in December 2020; and the Comment Letter asked CF II to amend the Form S-4 in several respects. (Compl., ¶ 52)

49.     Prakash led View's effort to prepare a response to the SEC Comment Letter. (Compl., ¶ 53)

50.     The SEC complaint alleges that, as a result of Prakash's misconduct, the amended Form S-4, filed on January 26, 2021, continued to fail to disclose View's Installation Costs. (Compl., ¶ 56)

51.     The SEC alleges that, in connection with the proposed de-SPAC merger transaction, on February 16, 2021, CF II filed with the SEC a Prospectus/Proxy Statement that included Private View's financial statements. (Compl., ¶ 58)

52.     The SEC complaint alleges that all information regarding View in the Prospectus/Proxy Statement had been supplied by View. (*Id.*)

COMPLAINT

53. The SEC complaint alleges that Prakash's name was used throughout the Prospectus/Proxy Statement. (Compl., ¶ 59)

54. The SEC complaint alleges that on March 12, 2021, Public View filed with the SEC a Current Report on Form 8-K disclosing the de-SPAC merger transaction between CF II and Private View on March 8, 2021. (Compl., ¶ 60)

55. The SEC Complaint alleges that, on or around May 17, 2021, Public View filed with the SEC a Quarterly Report on Form 10-Q for the quarter ending March 31, 2021. (Compl., ¶ ¶ 66-68)

56. The SEC alleges that all the SEC filings were materially misleading.

57. Notably, the SEC Lawsuit alleges that during December 2020 through November 2021, the period that its financial statements were materially misstated, View obtained money or property from the sale of its securities. (Compl., ¶ 75)

58. On July 31, 2025, the parties filed Motions for Summary Judgment in the SEC Lawsuit.

59. Attached as an exhibit to the SEC's Motion for Summary Judgment is Prakash's sworn testimony provided to the SEC's staff on June 6, 2022, in which he states that the de-SPAC merger transaction is an initial public offering and a SPAC IPO. A copy of Mr. Prakash's sworn testimony is annexed hereto as **Exhibit 12**.

### III.    The Mehedi Lawsuit

60. On August 21, 2023, a Second Amended Complaint ("SAC") was filed in the Mehedi Lawsuit. A copy of the SAC in the Mehedi Lawsuit is annexed hereto as **Exhibit 3**.

61. The SAC names as defendants the following persons and entities: Public View, f/k/a CF II and n/k/a/ View Operations, LLC; Rao Mulpuri; Howard W. Lutnick; Paul Pion; Alice Chan; Anshu Jian; Robert J. Hochberg; Charlotte S. Blechman; CF Finance Holdings II, LLC; Cantor

COMPLAINT

Fitzgerald & Co.; Cantor Fitzgerald, L.P.; CF Group Management, Inc.; and Prakash (collectively, the "Defendants").

62.     The SAC asserts claims against Defendants under Sections 10(b), 14(a), and 20(a) of the Exchange Act on behalf of a class consisting of (i) all persons or entities who purchased or otherwise acquired Public View and/or CF II securities between November 30, 2020 and November 9, 2021, inclusive and (ii) all persons or entities who were holders of CF II Class A common stock as of the Record Date that were entitled to vote to approve the de-SPAC merger transaction between Private View and CF II as set forth in the February 16, 2021 Proxy Statement.

63.     The SAC alleges that CF II and Private View combined via a de-SPAC merger transaction, with Public View as the surviving public entity.

64.     The SAC alleges that Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about View's business, operations, and prospects.

65.     As to Public View and its current and former directors and officers, the SAC alleges that they made false and misleading statements and material omissions in SEC-related filings on March 12, 2021; April 7, 2021; May 12, 2021; May 17, 2021; and March 7, 2022.

66.     The SAC alleges that, with respect to the February 16, 2021 Proxy Statement/Prospectus in connection with Private View's public offering through the de-SPAC merger transaction, its D&Os were negligent in permitting the use of their names in solicitations and in drafting the Proxy Statement/Prospectus.

67.     On July 18, 2025, the court in the Mehedi Lawsuit entered an Order preliminarily approving a settlement and providing notice. A copy of the Order is annexed hereto as **Exhibit 4.**

68.     The court, for purposes of effectuating settlement, certified a class consisting of: (1) all persons or entities who purchased or otherwise acquired CF II and/or Public View securities between November 30, 2020 and May 10, 2022, inclusive (the "Class Period"); (2) all persons or

COMPLAINT

entities who were holders of CF II Class A common stock as of the January 27, 2021 record date (the "Record Date") that were entitled to vote to approve the de-SPAC merger as set forth in the February 16, 2021 Proxy Statement; and (3) all persons or entities who purchased or otherwise acquired View securities pursuant to or traceable to the De-SPAC Registration Statement.

## IV.    Third-Party Discovery SEC Lawsuit Subpoenas

69.    The Hughes Subpoenas, which are dated July 26, 2024, were issued to Harold Hughes in connection with the SEC Lawsuit. Copies of the Hughes Subpoenas are annexed hereto as **Exhibit 5**.

70.    The Hughes Subpoenas were issued by attorneys litigating and/or defending the SEC Lawsuit.

71.    The Hughes Subpoenas seek the deposition of Mr. Hughes.

72.    The Hughes Subpoenas seek documents, including those relating to Public View's restatement of its financial statements, the investigation by Public View's Audit Committee into alleged impropriety and documents regarding Prakash's departure from Public View.

73.    The relevant time period covered by the Hughes Subpoenas is January 1, 2019 through July 26, 2024.

74.    The Leppert Subpoenas, which are dated October 25, 2024 and April 4, 2025, were issued to Thomas Leppert in connection with the SEC Lawsuit. Copies of the Leppert Subpoenas are annexed hereto as **Exhibit 6**.

75.    The Leppert Subpoenas were issued by attorneys litigating and/or defending the SEC Lawsuit.

76.    The Leppert Subpoenas seek the deposition of Mr. Leppert.

77.    The Leppert Subpoenas seek documents, including those relating to Public View's restatement of its financial statements, the investigation by Public View's Audit Committee into

alleged impropriety, documents relating to the SEC investigation and documents regarding Prakash's departure from Public View.

78.     The relevant time period covered by the Leppert Subpoenas is January 1, 2019 through November 15, 2024.

## V.     Prakash's Advancement Action Against Public View

79.     On May 30, 2025, Prakash filed a Verified Amended Complaint for Advancement against View Operations, LLC, f/k/a/ Public View in a matter captioned *Vidul Prakash v. View Operations, LLC*, CA. No. 2025-0531-CDW, Delaware Chancery Court ("Advancement Action"). A copy of the Verified Amended Complaint is annexed hereto as **Exhibit 7**.

80.     The Advancement Action stemmed from Public View's "wrongful refusal to advance Prakash's expenses in connection with investigations, proceedings and events stemming from Prakash's role as the former Chief Financial Officer of View." (Compl., ¶ 1)

81.     Prakash alleged that Public View actively frustrated Prakash's rights by delaying and refusing to pay fees and expenses to which Prakash was entitled, dating back to at least October 2024. (Compl., ¶ 2)

82.     Prakash alleged that his advancement rights flowed from governing documents and an indemnification agreement. (Compl., ¶ 2)

83.     Prakash alleged that he was entitled to his attorneys fees and expenses associated with an Audit Committee Investigation, SEC Investigation, SEC Lawsuit, Mehedi Lawsuit, and other Protective Actions.  (Compl., ¶¶ 22-26)

84.     Prakash alleged that View Operations, LLC was known as Public View, before it converted into a limited liability company in 2024. (Compl., ¶ 3)

85.     Prakash alleged that he served as View's CFO both before and after "View went public through a de-SPAC transaction." (Compl., ¶ 4)

COMPLAINT

86.     Prakash alleged that Public View owed him millions of dollars in advanceable expenses. (Compl., ¶ 37)

87.     On June 20, 2025, Prakash filed a Motion for Summary Judgment ("MSJ") in the Advancement Action. A copy of the MSJ is annexed hereto as **Exhibit 8**.

88.     Prakash's MSJ represented to the Delaware Chancery Court that "[i]n March 2021, View completed an initial public offering through a de-SPAC merger transaction with CF Finance Acquisition Corp. II." (*Id*.)

89.     On July 16, 2025, the day before the Delaware Chancery Court had scheduled a hearing for Prakash's MSJ, the parties filed a letter advising that they agreed to settle the Advancement Action pursuant to a stipulation and proposed order establishing a procedure for payment of advancement and fees-on-fees by Public View.

90.     On July 17, 2025, the Delaware Chancery Court granted the Stipulation and Order establishing a procedure for payment of advancement and fees-on-fees by Public View. A copy of the Stipulation and Order is annexed hereto as **Exhibit 9**.

## THE POLICIES

### I.    Private View's Insurance Tower

#### A.   The StarStone Policy

91.     StarStone issued a Management and Professional Liability Follow Form Excess Liability Insurance Policy, number U70371200ASP, to Private View for the policy period of February 28, 2020 to March 14, 2021 (as amended by Endorsement 5). A copy of StarStone's Policy is annexed hereto as **Exhibit 10**.

92.     Endorsement 6 provides that "[p]ursuant to Section II. Conditions D. Extending Reporting Period Coverage of the Policy, the **Insureds** have purchased an extended reporting period

- 13 -

of 72 months. The extended reporting period shall commence on March 8, 2021 at 12:01 A.M. and expire on March 8, 2027 at 12:01 A.M. local time at the address stated in Item I. of the Declarations."

93.    The StarStone Policy provides liability limits of $5 million each **Claim** and in the aggregate, inclusive of defense costs, in excess of $20 million in limits.

94.    The **Underlying Policies** consist of Ironshore Specialty Insurance Company policy No. 004325400, which provides $5 million in limits, subject to a $200,000 each **Claim** deductible; Westchester Fire Insurance Company policy number G71786663 001, which provides $5 million in limits in excess of $5 million; AXIS Insurance Company policy number P-001-000312824-01, which provides $5 million in limits in excess of $10 million; and Beazley Insurance Company policy number V2A68A200101, which provides $5 million in excess of $15 million.

95.    The Insured has represented to StarStone that the underlying $20 million in limits have been or will shortly become exhausted.

96.    The StarStone Policy contains the following insuring agreement:

> The Insurer shall provide excess coverage for Claims first made during the Policy Period or, if applicable, the extended reporting period. This Policy, except as stated herein, is subject to all of the terms, conditions, representations, limitations and restrictions contained in the Followed Policy as of the inception date of this Policy. In no event shall this Policy grant broader coverage than would be provided by the most restrictive Underlying Policy.

97.    The StarStone Policy contains the following conditions:

**III. CONDITIONS**

**A.    UNDERLYING INSURANCE**

1. Liability for any covered Loss resulting from covered Claims shall attach to the Insurer only after the insurers of the Underlying Policy(ies), the Insureds or any DIC Insurer have paid in legal currency Loss covered under the respective Underlying Policy(ies) equal to the full amount of the Underlying Limit. The Insurer shall then be liable to pay only covered Loss in excess of such Underlying Limit up to the Limit(s) of Liability specified in Item 3 of the Declarations.

2. This Policy shall drop down to the extent the Underlying Limit is paid as described in paragraph A.1. above and shall not drop down for any other reason including

- 14 -

COMPLAINT

but not limited to uncollectability, in whole or in part, of any Underlying Policy or any insurance provided by a DIC Insurer. The risk of such uncollectability, whether because of financial impairment or insolvency or for any other reason, is expressly retained by the Insureds and is not in any way or under any circumstances insured or assumed by the Insurer.

3. If any **Underlying Policy** contains a specific grant of coverage that is subject to a sublimit of liability or a supplementary payment, then this Policy shall not provide such coverage. However, this Policy shall recognize any reduction and, if applicable, exhaustion of the **Underlying Limit** by payment under such coverage.

98.    The StarStone Policy contains the following relevant definitions:

### III.    DEFINITIONS

1. **Followed Policy** means the policy specified in Item 5 of the Declarations.

2. **Insureds** means all natural persons and entities insured by the Followed Policy.

3. **Underlying Limit** means an amount equal to the total limits of liability of all Underlying Policies, plus the retention, deductible, and/or coinsurance, if any, applicable under the Underlying Policy(ies).

4. **Underlying Policy(ies)** means the Followed Policy and any other policies listed in Item 6 of the Declarations.

### B.   The Primary (Ironshore) Policy

99.    The StarStone Policy follows form to the Primary Policy issued to Private View.

100.    Ironshore issued Capital Portfolio Company Insurance Policy, No. 004325400, to Private View for the period of February 28, 2020 to March 14, 2021 (the "Primary Policy"). A copy of the Primary Policy is annexed hereto as **Exhibit 11**.

101.    Endorsement No. 12, entitled "Run-Off Coverage" defines the "Run-Off Period" as March 8, 2021 through March 8, 2027.

102.    The Primary Policy, which is exhausted, contains the following relevant Insuring Agreement:

**(2):**    **Company Reimbursement**

The Insurer shall pay on behalf of the **Company Loss** arising from a **Claim** first made against an **Insured Person** during the **Policy Period** or, if

- 15 -

applicable, the **Extended Reporting Period,** and reported to the Insurer pursuant to the terms of this Policy, for a **Wrongful Act,** but only when and to the extent that the **Company** has indemnified such **Insured Person** for such **Loss**.

103.    The Primary Policy defines a **Claim** to mean a "civil, administrative, regulatory, arbitration or mediation or other alternative dispute resolution proceeding commenced by an **Insured's** receipt of a summons, complaint, demand for arbitration, request for injunction, notice of charges, order to show cause, or other similar pleading, or any foreign equivalent of the foregoing."

104.    **Company** "means the **Named Insured** and any **Subsidiary,** and in the event any bankruptcy proceedings shall be instituted by or against the **Named Insured** or any **Subsidiary,** the resulting debtor-in-possession."

105.    **Defense Costs** "means all reasonable costs, charges, fees and expenses incurred by an **Insured** in the investigation, defense or appeal of any **Claim,** including costs, charges, fees and expenses incurred by an **Insured** to defend against any **Extradition** of such **Insured Person** and the premium for any appeal bond, attachment bond or similar bond, provided that the **Insurer** has no obligation to apply for or to furnish any such bond provided, however, **Defense Costs** shall not include compensation, or benefits of any **Insured**."

106.    **Insured** means, in relevant part, an **Insured Person** or the **Company**.

107.    **Loss** means damages, judgments, settlements and **Defense Costs** incurred by any **Insured** on account of any **Claim**.

108.    **Wrongful Act** means, in relevant part, any error, misstatement, misleading statement, act, omission, neglect, or breach of duty, actually or allegedly committed or attempted by any **Insured Person** in his or her capacity (including in such **Insured Person's** capacity as a controlling or selling shareholder) as such, or any matter claimed against any **Insured Person** by reason of his or her serving in such capacity, with respect to and Insuring Agreement A2, **Company** Reimbursement.

- 16 -

COMPLAINT

109.    Under the Primary Policy, the **Insurer** shall not pay **Loss** on account of any **Claim** alleging, based upon, arising out of, or attributable to any public offering of equity securities of the **Company** or the purchase or sale of, or offer or solicitation of an offer to purchase or sell, such equity securities subsequent to such public offering ("Securities Exclusion").

110.    The Primary Policy's Run Off Endorsement states that coverage for a **Claim** made during the Run-Off Period shall apply solely with respect to any **Wrongful Act** committed or alleged to have been committed prior to the Effective Date.

## II.    CF II's Insurance Tower

111.    Endurance American Specialty Insurance Company issued CF II New York Primary Management Liability Insurance for Public Companies Policy No. DOP3000193100 effective August 26, 2020 to March 8, 2021, with Run-Off Coverage from March 8, 2021 to March 8, 2027.

## III.    Public View's Insurance Tower

112.    Federal Insurance Company issued Public View a Primary Directors & Officers and Entity Securities Liability Insurance Policy effective March 8, 2021 through March 8, 2022.

113.    Public View has a second layer excess policy with Beazley Insurance Company; a third layer excess policy with Everest; and a fourth layer excess policy with Arch Insurance Company.

114.    Public View also has a Side-A policy with XL Insurance Company; and a Side-A only excess policy with Ironshore Insurance Company.

## THE PARTIES' COVERAGE DISPUTE

115.    On January 19, 2023, StarStone sent a coverage position letter to Private View regarding matters that were noticed under the StarStone Policy, including the Mehedi Lawsuit.

116.    StarStone advised that because it had no indication that the insurers of the **Underlying Policy(s)**, the **Insureds** or a **DIC Insurer** had paid in legal currency **Loss** covered under the

- 17 -

COMPLAINT

respective **Underlying Policy(ies)** equal to the full amount of the **Underlying Limit**, coverage was not currently available regardless of any coverage issues.

117.    Nevertheless, StarStone advised Private View and the **Insureds** that it adopted and incorporated by reference the Primary Insurer's coverage position letter as set forth in its correspondence dated August 31, 2022.

118.    StarStone further advised Private View and the **Insureds** that it appeared that the Securities Exclusion barred coverage for all the underlying matters, including the Mehedi Lawsuit.

119.    StarStone also generally reserved its rights pursuant to other terms and exclusions.

120.    StarStone did not receive a written response from Private View regarding the January 19, 2023 letter.

121.    On October 16, 2023, StarStone sent another coverage position letter to Private View and the **Insureds** addressing additional matters noticed under the StarStone Policy, including the SEC Lawsuit.

122.    StarStone generally adopted the same coverage position as set forth in its January 19, 2023 coverage correspondence.

123.    StarStone did not receive a written response from Private View regarding the October 16, 2023 letter.

124.    On December 30, 2024, StarStone sent correspondence to Private View's coverage counsel, denying coverage for the Mehedi Lawsuit based on the Securities Exclusion.

125.    On January 8, 2025, StarStone sent correspondence denying coverage for the Hughes Subpoenas.

126.    On February 26, 2025, StarStone sent correspondence to Private View, denying coverage for the SEC Lawsuit based on the Securities Exclusion.

127. On April 11, 2025, StarStone sent correspondence denying coverage for the Leppert Subpoenas.

128. On May 14, 2025, StarStone received correspondence from Prakash's coverage counsel, challenging StarStone's coverage denial with respect to the SEC Lawsuit.

129. On May 29, 2025, StarStone sent a response letter to Prakash's coverage counsel, standing by its coverage denial with respect to the Securities Exclusion and SEC Lawsuit.

130. On June 17, 2025, StarStone received a letter from counsel for "View Operations LLC (fka View, Inc., fka CF Finance Acquisition Corp. II) and its wholly owned subsidiary View Operating Corporation (fka View, Inc., aka "Legacy View")."

131. The June 17, 2025 letter challenged StarStone's coverage position regarding the Securities Exclusion with respect to the Mehedi and SEC Lawsuits, and demanded $1 million for a settlement associated with the Mehedi Lawsuit.

132. On June 26, 2025, StarStone responded to the June 17, 2025 letter, standing by its coverage denial based on the Securities Exclusion.

133. On July 21, 2025, counsel for "View Operations LLC (fka View, Inc., fka CF Finance Acquisition Corp. II) and its wholly owned subsidiary View Operating Corporation (fka View, Inc., aka "Legacy View")" sent StarStone, via email, several invoices and charts demanding coverage for $2,048,478.57 in fees for the Third-Party Discovery SEC Lawsuit Subpoenas and $100,503.96 in fees for the Mehedi Lawsuit.

134. In the July 21, 2025 email to StarStone, counsel advised that Private View would is seeking coverage for the $2,148,982.53 in fees outlined in Paragraph 122 under Insuring Clause 2 – Company Reimbursement under the StarStone Policy.

COMPLAINT

## CASE & CONTROVERSY

135.    The defense and indemnification coverage Private View and Prakash have sought from StarStone involves damages in excess of Seventy-Five Thousand Dollars ($75,000.00).

136.    Coverage, however, is barred by the terms, limitations, conditions, definitions, and exclusions of the Primary Policy and StarStone Policy.

137.    Private View and Prakash have made a claim for coverage under the StarStone Policy with respect to the Reported Matters.

138.    StarStone therefore avers that a *bona fide* case and controversy exists as between StarStone, on the one hand, and Private View and Prakash, on the other hand, regarding claimed insuring obligations under the StarStone Policy referenced herein, which is ripe for disposition.

### FIRST CAUSE OF ACTION[5]
### (The Securities Exclusion Bars Coverage for the Reported Matters)

139.    StarStone incorporates by reference Paragraphs 1 through 138 of this Complaint as if set forth at length herein.

140.    StarStone is under no obligation to provide defense or indemnification coverage to Private View or Prakash with respect to the Reported Matters, per the express terms, conditions, and exclusions of the Primary Policy and StarStone Policy.

141.    Pursuant to the Securities Exclusion, StarStone shall not pay **Loss** on account of any **Claim** alleging, based upon, arising out of, or attributable to any public offering of equity securities of the **Company** or the purchase or sale of, or offer or solicitation of an offer to purchase or sell, such equity securities subsequent to such public offering.

142.    On March 8, 2021, Private View completed an initial public offering through a de-SPAC merger transaction with CF II, resulting in Public View.

---

[5] By listing any matter as a cause of action, StarStone does not assume the burden of proving any matter upon which Private View and Prakash bear the burden of proof under applicable law as alleged **Insureds**.

- 20 -

COMPLAINT

143. The de-SPAC merger transaction was Private View's initial public offering because it marked the introduction of Private View to the U.S. public securities markets.

144. As the target company, and party to the de-SPAC merger transaction, Private View, in connection with its public offering, issued its own securities.

145. The de-SPAC merger transaction was Private View's initial public offering because it resulted in Private View becoming part of an SEC reporting company—that is, CF II.

146. The de-SPAC merger transaction was Private View's initial public offering because it provided Private View with access to cash proceeds that CF II had previously raised from the public.

147. The de-SPAC merger transaction was Private View's initial public offering because the shareholders of CF II went from owning shares in a shell company to owning shares in Public View, which conducted the business of Private View.

148. The **Insured** admitted in the Advancement Action that Private View "completed an initial public offering through a de-SPAC merger transaction with CF Finance Acquisition Corp. II." (*See* **Exhibit 8**)

149. The **Insured** provided sworn testimony to the SEC stating that the de-SPAC merger transaction is an initial public offering and a SPAC IPO. (*See* **Exhibit 12**)

150. The Reported Matters allege that Private View completed an initial public offering through a de-SPAC merger transaction with CF II.

151. The Reported Matters include allegations and securities-related violations based upon, arising out of, and attributable Private View's public offering of equity securities, as well as the purchase or sale of, or offer or solicitation of an offer to purchase or sell, such equity securities subsequent to such public offering.

152. Accordingly, the Securities Exclusion bars coverage for the Reported Matters in their entirety and StarStone owes no defense or indemnification coverage to Private View or Prakash.

COMPLAINT

153.    StarStone has complied with all terms and conditions under the StarStone Policy, or is excused from doing so based on Private View's and Prakash's conduct.

154.    StarStone is entitled to a declaration, pursuant to 28 U.S.C. §2201, that it has no obligation to provide coverage to Private View or Prakash under the StarStone Policy with respect to the Reported Matters.

155.    There is no adequate remedy, other than that requested herein, by which this controversy may be resolved.

### SECOND CAUSE OF ACTION
**(The Third-Party Discovery SEC Lawsuit Subpoenas Do Not Trigger Coverage Under the StarStone Policy)**

156.    StarStone incorporates by reference Paragraphs 1 through 155 of this Complaint as if set forth at length herein.

157.    Pursuant to the express terms, conditions, and exclusions of the Primary Policy and StarStone Policy, StarStone is under no obligation to provide coverage to Private View with respect to the Third-Party Discovery SEC Lawsuit Subpoenas.

158.    Under Insuring Clause 2 – Company Reimbursement in the Primary Policy, to which the StarStone Policy follows form, the Insurer shall pay on behalf of the **Company Loss** arising from a **Claim** first made against an **Insured Person** during the **Policy Period** or, if applicable, the **Extended Reporting Period,** and reported to Insurer pursuant to the terms of the Policy, for a **Wrongful Act,** but only when and to the extent that the **Company** has indemnified such **Insured Person** for such **Loss**.

159.    The Primary Policy's Run Off Endorsement, to which the Starstone Policy follows form, states that coverage for a **Claim** made during the Run-Off Period shall apply solely with respect to any **Wrongful Act** committed or alleged to have been committed prior to the Effective Date.

- 22 -

COMPLAINT

160. The Third-Party Discovery SEC Lawsuit Subpoenas were issued pursuant to Rule 45 of the Federal Rules of Civil Procedure ("FRCP 45").

161. FRCP 45 is the vehicle that parties to civil litigation use to obtain discovery, such as depositions and documents, from non-parties.

162. Mr. Leppert and Mr. Hughes are not defendants in the SEC Lawsuit.

163. Mr. Leppert and Mr. Hughes received the Third-Party Discovery SEC Lawsuit Subpoenas for discovery purposes in connection with the SEC Lawsuit.

164. No wrongful conduct has been asserted or alleged against Mr. Leppert or Mr. Hughes in the SEC Lawsuit or Third-Party Discovery SEC Lawsuit Subpoenas.

165. Accordingly, the Third-Party Discovery SEC Lawsuit Subpoenas do not allege any **Wrongful Act** by Mr. Leppert or Mr. Hughes in their capacity as an **Insured Person**.

166. In addition, no claims or causes of action have been or are asserted against Mr. Leppert or Mr. Hughes in the SEC Lawsuit or Third-Party Discovery SEC Lawsuit Subpoenas.

167. The Third-Party Discovery SEC Lawsuit Subpoenas were also prepared and issued to Mr. Leppert and Mr. Hughes by attorneys during discovery of the SEC Lawsuit.

168. The Third-Party Discovery SEC Lawsuit Subpoenas do not seek "relief" as that term is used in the definition of a **Claim**.

169. Accordingly, the Third-Party Discovery SEC Lawsuit Subpoenas do not qualify as a **Claim** under the StarStone Policy.

170. For these reasons, the Third-Party Discovery SEC Lawsuit Subpoenas do not trigger coverage under the StarStone Policy.

171. StarStone has complied with all terms and conditions under the StarStone Policy, or is excused from doing so, based on Private View's conduct.

- 23 -

COMPLAINT

172.    StarStone is entitled to a declaration, pursuant to 28 U.S.C. §2201, that it has no obligation to provide coverage to Private View under the StarStone Policy with respect to the Third-Party Discovery SEC Lawsuit Subpoenas.

173.    There is no adequate remedy, other than that requested herein, by which this controversy may be resolved.

**WHEREFORE**, StarStone Specialty Insurance Company, Inc. respectfully requests that this Honorable Court enter an Order:

(1)    Declaring that StarStone Specialty Insurance Company has no obligation to provide defense or indemnification coverage to Private View or Prakash in connection with: (1) *SEC v. Prakash*, No. 23-cv-03300, U.S. District Court for the District of Northern California; (2) *Mehedi v. View, Inc. f/k/a CF Finance Acquisition Corp. II, et al.*, No. 5:21-cv-06374, U.S. District Court for the District of Northern California; (3) a Subpoena To Produce Documents, Information, or Objects or Permit Inspection of Premises in a Civil Action and a Subpoena to Testify at a Deposition in a Civil Action issued to Thomas Leppert; and (4) a Subpoena To Produce Documents, Information, or Objects or Permit Inspection of Premises in a Civil Action and a Subpoena to Testify at a Deposition in a Civil Action issued to Harold Hughes; and

(2)    A Judgment and/or Order for such other relief consistent with the claims and causes of action asserted in this Complaint.

Dated:  August 1, 2025

Respectfully submitted,

*/s/ Angel Marti, III*
Angel Marti III
COZEN O'CONNOR
601 S. Figueroa Street, Suite 3700
Los Angeles, CA 90017
Telephone: 213-892-7979
Facsimile: 213-784-9090
AMarti@cozen.com

Rafael Rivera, Jr. (To be admitted *Pro Hac Vice*)
COZEN O'CONNOR
3 WTC, 175 Greenwich Street, 55th Floor
New York, NY 10007
Telephone: (212) 453-3879
Facsimile: (646) 588-1372
rafaelrivera@cozen.com

COMPLAINT

Gary L. Gassman (To be admitted *Pro Hac Vice*)
COZEN O'CONNOR
123 North Wacker Drive, Suite 1800
Chicago, IL 60606
Telephone: (312) 382-3100
Facsimile: (312) 382-8910
ggassman@cozen.com
*Attorneys for Defendant StarStone Specialty  Insurance
Company*

- 25 -

COMPLAINT